**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRISHA ACHEAMPONG, on behalf herself and all other persons similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> JBG SMITH MANAGEMENT SERVICES, L.L.C. <br><br> Defendant. | Case No. 1:26-cv-00225-CKK <br> Judge Colleen Kollar-Kotelly |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………………...1

FACTUAL ALLEGATIONS ................................................................................................. 3

LEGAL STANDARD ............................................................................................................ 5

ARGUMENT ......................................................................................................................... 5

I.  Plaintiff's CPPA claims are adequately pled................................................................... 5

    A.   The CPPA claims primarily turn on interpreting the RHA and Housing Code............... 5

    B.   The Disclosure Claim is adequately pled and Plaintiff has standing to bring it. ............ 7

        i. The Disclosure Claim is adequately pled...................................................................... 7

        ii. Plaintiff has standing to bring the Disclosure Claim because she has suffered monetary and informational injury............................................................................. 10

    C.   The Service Fee Claim is adequately pled. ................................................................... 12

    D.   The Utility/Trash Claim is adequately pled. ................................................................. 14

    E.   The Fee Provision Claim is adequately pled and Plaintiff has standing to bring it. ...... 16

        i. The Fee Provision Claim is adequately pled................................................................. 16

        ii.Plaintiff has standing to bring the Fee Provision Claim because the statutory violation is analogous to contractual harm protected against by common law........ 17

    F.   There are no claims asserted against JBGS affiliates to dismiss. ................................. 21

II.The primary jurisdiction doctrine does not apply. ....................................................... 22

    A.   Primary jurisdiction does not apply where no administrative remedy exists. .............. 22

    B.   The primary jurisdiction factors do not come close to being met................................. 23

CONCLUSION.................................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**

*AAPS v. FDA*, 226 F. Supp. 2d 204 (D.C. Cir. 2002) ................................................................... 17

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 244 (1937) .......................................................... 18

*Altvater v. Freeman*, 319 U.S. 359, 365 (1943) .......................................................................... 19

*APCC Servs v. Worldcom, Inc.*, 305 F. Supp. 2d 1 (D.D.C. 2001) .................................................. 23

*Ass'n for Cmty. Aff. Plans v. U.S. Dep't of Treas.*, 392 F. Supp. 3d 22 (D.D.C. 2019) ................. 15

*Attias v. Carefirst, Inc.*, 346 F.R.D. 1 (D.D.C. 2024) ............................................................. 18, 20

*Banneker Ventures, LLC v. Graham,* 798 F.3d 1119 (D.C. Cir. 2015) ............................................. 3

*Bendix Forest Prods. Corp. v. Div. of Occup. Safety & Health*,
  25 Cal. 3d 465 (Cal. 1979) ......................................................................................................... 14

*Carpenters Indus. Council v. Zinke,* 854 F.3d 1 (D.C. Cir. 2017) .................................................. 10

*Castro v. Molecular Sys.*, 963 F. Supp. 2d 3 (D.D.C. 2013) ........................................................... 4

*Chao v. Day*, 436 F.3d 234 (D.C. Cir. 2006) ............................................................................ 6, 12

*City of Roseville v. Norton*, 348 F.3d 1020 (D.C. Cir. 2003) ........................................................ 14

*Collins v. Yellen*, 594 U.S. 220 (2021) ......................................................................................... 10

*Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714 (D.C. 2003) ................................................ 5

*Dist. of Columbia v. 76M Inc.*,
  2021 D.C. Super. LEXIS 157 (D.C. Super. Ct. Dec. 2, 2021) ................................................... 6, 24

*Dist.of Columbia. Water & Sewer Auth. v. Delon Hampton & Assocs.*,
  851 A.2d 410 (D.C. 2004) ........................................................................................................... 22

*Doe v. Bozzuto Mgmt. Co.*, 2024 U.S. Dist. LEXIS 110395, at *20 (D.D.C. June 24, 2024) ....... 11

*Drayton v. Poretsky Mgmt., Inc.*, 462 A.2d 1115 (D.C. 1983) ....................................................... 24

*Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654 (D.C. 2024) ..................................................... 6

*Equal Rights. Ctr. v. Vesta Corp.*,

2024 D.C. Super. LEXIS 44 (D.C. Super. Ct. Sept. 19, 2024) ................................................ 24

*Gadelhak v. AT&T Servs.*, 950 F.3d 458 (7th Cir. 2020)............................................................. 18, 20

*Goodman v. Mept Anthology, LLC*,
2024 D.C. Super. LEXIS 28, *8 (D.C. Super. Ct. Sept. 25, 2024) ............................................ 17

*Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053 (D.C. 2014)..................................................... 15

*Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511 (D.C. Cir. 2016) .................................................. 21

*Hernstadt v. FCC*, 677 F.2d 893 (D.C. Cir. 1980) ................................................................. 7, 13

* *Hettinger v. Bozzuto Mgmt. Co.*,
2025 U.S. Dist. LEXIS 138890 (D.D.C. July 21, 2025)......................................6, 7, 8, 9, 11, 24

*In re White*, 64 F.4th 302 (D.C. Cir. 2023)....................................................................... 21

*Ind. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638 (D.C. Cir. 2000).................................... 15, 16

*Jones v. Glendale Apt. Props. LLC*,
2025 U.S. Dist. LEXIS 181882 (D. Md. Sept. 17, 2025) .......................................................... 21

*Kelly v. Realpage Inc.*, 47 F.4th 202 (3d Cir. 2022).........................................................11

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)....................................................... 24, 25

*Magna Vend v. Cournoyer*, 1985 Mass. App. Div. 75 (Mass. Ct. App. 1985)............................. 14

*Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395 (S.D.N.Y. 2012)............................................. 21

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ....................................................... 19, 20

*Miller v. City of Tacoma*, 138 Wn.2d 318 (Wash. 1999)................................................................ 16

*Queen v. OliveTree Mgmt. LLC*,
2025 U.S. Dist. LEXIS 185112 (D. Md. Sept. 22, 2025) .......................................................... 21

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) .......................... 16, 23

*Republic of Venezuela v. Philip Morris, Inc.*, 287 F.3d 192 (D.C. Cir. 2002)................................. 5

*Schiller v. Tower Semi., Ltd.*, 449 F.3d 286 (2d Cir. 2006) ......................................................... 24

*Scott v. Apple, Inc.*, 757 F. Supp. 3d 1 (D.D.C. 2024) ................................................................. 6

*Seneca v. Homeaglow Inc.*, 2025 U.S. Dist. LEXIS 218375
(C.D. Cal. Sept. 23, 2025) ................................................................................... 10

*Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039 (D.C. Cir. 2010) .......................................... 5

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .............................................................. 11

*Transbrasil SA Linhas Aereas v. U.S. Dep't of Transp.*,
791 F.2d 202 (D.C. Cir. 1986) .............................................................................. 14

\* *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ................................ 2, 10, 11, 17, 18

*United States v. Phillip Morris USA, Inc.*, 787 F. Supp. 2d 68 (D.D.C. 2011) ............................. 23

*Valentine v. United States*, 706 F. Supp. 77, 81 (D.D.C. 1989) ....................................... 15, 17, 24

*Veera v. Banana Republic, LLC*, 6 Cal. App. 5th 907 (Cal. Ct. App. 2016) .................................. 10

*Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612 (D.C. Cir. 2023) ................................. 5

*Zambali v. Shulman Rogers*, 2024 U.S. Dist. LEXIS 111183 (D. Md. June 25, 2024) ................ 21

## STATUTES

28 U.S.C. § 1447(c) ...................................................................................................... 5

D.C. Code § 28–3901(c) .............................................................................................. 12

D.C. Code § 28–3904(e-1) ........................................................................................... 18

D.C. Code § 28–3905(k)(1)(A) ...................................................................................... 5

D.C. Code § 28–3905(k)(2) .......................................................................................... 25

D.C. Code § 28–3905(k)(6) ............................................................................. 6, 12, 17, 25

D.C. Code § 32–808(a) ............................................................................................... 15

D.C. Code § 42–3501.03(28) ......................................................................................... 7

D.C. Code § 42–3502.04(c) .......................................................................................... 22

D.C. Code § 42–3502.06(e) .......................................................................................... 22

D.C. Code § 42–3502.17(b) .......................................................................................... 22

D.C. Code § 42–3502.22(b)(1)(A) .......................................................................................... 7

D.C. Code § 42–3505.10(b-2)(1) ...................................................................................... 4, 12

## OTHER AUTHORITIES

E. Chemerinsky, *What's Standing After TransUnion LLC v. Ramirez*,
    96 N.Y.U. L. Rev. 269, 372 (2021) ................................................................................. 18

MERRIAM-WEBSTER DICTIONARY ...................................................................................... 17

## TREATISES

RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) .................................................... 19

## REGULATIONS

14 D.C.M.R. § 304.4 ................................................................................................... 4, 16, 17

14 D.C.M.R. § 600.1 ....................................................................................................... 13, 14

14 D.C.M.R. § 600.3 ......................................................................................................... 4, 14

15 D.C.M.R. § 4407 ............................................................................................................... 15

15 D.C.M.R. § 4407.12 .......................................................................................................... 15

**INTRODUCTION**

This is a consumer protection class action originally filed in D.C. Superior Court by Plaintiff Trisha Acheampong, a tenant, against Defendant JBG Smith Management Services, LLC (JBGS), her landlord. As relevant here, Plaintiff challenges the following four trade practices that JBGS employed across its District properties, in violation of protections conferred by the D.C. Rental Housing Act ("RHA") and D.C. Housing Code ("Housing Code") regulations, in turn contravening the D.C. Consumer Protection Procedures Act ("CPPA").

First, JBGS fails to disclose the complete apartment "rent" to prospective tenants "[a]t the time" they file their rental applications, as required by the RHA, by omitting a "Service Fee" of $5.00/month that tenants must pay JBGS. That fee falls well within the RHA's definition of "rent," which covers "money [] received" by a landlord.

Second, the actual charge of this Service Fee violates the RHA's prohibition against landlords charging any fees to "maintain a unit [] consistent with the implied warranty of habitability" as the Service Fee is paid for the billing of utilities, which are necessary to maintain a unit's habitability.

Third, JBGS charges tenants for utilities that are exclusively within its control, such as electric utilities in common areas and trash services. Such cost-shifting violates the Housing Code's requirement that landlords "furnish" utilities within their control.

Fourth, JBGS's lease includes a term requiring Plaintiff to "reimburse [JBGS] for all court costs" incurred to enforce her lease. This obligation violates the Housing Code's provision that landlords may not "place" in leases terms requiring the "tenant pay the owner's court costs."

The Court should find that each claim is adequately pled, applying basic principles of statutory interpretation, as no more is needed than construing the statutes' plain text. This result

1

would be supported by the legislative record, which reflects the D.C. Council's deliberate intent to expand tenant and consumer protections in the District. JBGS's Motion, by contrast, gives this interpretive exercise short shrift, glossing over the plain language and legislative history of the laws at issue. Such arguments that ignore the fundamentals of statutory construction should be discarded.

JBGS's procedural arguments fare no better. JBGS's attempt to dismiss the disclosure and cost-shifting claims on standing grounds are not compelling. JBGS's failure to disclose the Service Fee in violation of the RHA caused Plaintiff injuries that were monetary (through the eventual payment of the undisclosed Service Fee) and informational (by depriving her of her statutory entitlement to know the full price of apartments on the rental market)—both of which are concrete harms that establish standing under Article III. On the shift of legal fees by lease, the Supreme Court has made clear that plaintiffs can establish standing for a statutory violation by identifying a common-law analogue for the harm against which the statute protects. *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). Here, that historical analogue is clear, as the CPPA's prohibition of illegal contract terms bears a close relationship to the common law claim of the breach of the implied covenant of good faith and fair dealing, which has long protected against a contracting party's abuse of power to specify unfair terms.

Finally, the Court should reject JBGS's invitation to punt these questions of statutory interpretation to a local administrative agency by invoking primary jurisdiction, which does not apply since JBGS has failed to show that the administrative agency can resolve the interpretive disputes at issue. Nor is there basis to invoke the doctrine, as it is courts, not agencies, that have the final say on questions of statutory interpretation. Accordingly, the Court should deny JBGS's Motion in full.

## FACTUAL ALLEGATIONS

JBGS is a corporation that manages rental apartment buildings in the District. ECF 11, First Am. Compl. ¶ 3 (cited to as "¶ __"). In March 2024, Plaintiff entered a lease agreement with JBGS to rent an apartment in a residential building called "Judd & Weiler," which counts approximately 455 units. ¶¶ 3, 50. Plaintiff's lease is appended to JBGS's Motion and cited as ECF 18-3. The Complaint brings five subcounts under the CPPA, contending that JBGS engaged in the following unlawful trade practices in violation of the RHA and Housing Code.

1. **Disclosure Claim.** Sometime on or around March 3, 2024, Plaintiff filed a rental application, which disclosed a monthly "rent" of $1,560/month for a Judd & Weiler apartment. ¶¶ 41, 44. But when Plaintiff's rental application was later approved and JBGS presented her a lease, she learned that she would also have to pay JBGS a "Monthly Administrative Billing Fee" (*i.e.*, the "Service Fee" of $5.00/month that was not disclosed at the time of application). ¶¶ 43, 53. Plaintiff pays the Service Fee and all other monies required under her lease to JBGS directly, and those amounts are recorded on her rent ledger. ¶¶ 80–82: *see also* Ex. A, Partial Rent Ledger.[1] Plaintiff contends that the Service Fee is "rent" under the RHA. JBGS's failure to disclose it at the time she filed her rental application thus violated that law's disclosure requirement and thereby, the CPPA. ¶ 118(a).

2. **Service Fee Claim.** Plaintiff alleges that the Service Fee violates the RHA provision establishing that a landlord "shall not charge a fee ... for services required of the

---

[1] As the Complaint expressly references the Rent Ledger, the court may consider it without converting the motion to dismiss into a motion for summary judgment. ¶ 82 (providing screenshot of Rent Ledger); *Banneker Ventures, LLC v. Graham,* 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment.").

housing provider to maintain a unit in a condition consistent with the implied warranty of habitability." D.C. Code § 42–3505.10(b-2)(1).

3.     **Utility/Trash Claim.** JBGS charges Plaintiff on a monthly basis a variable rate for electricity usage in common areas ("Common Area Electric") and a fixed $20 fee for trash services, which are both utilities under JBGS's control. ¶¶ 80–86. Plaintiff contends that by shifting the cost of Common Area Electric and Trash fees to tenants, JBGS violates the Housing Code requirement that landlords "furnish[]" utilities under their control. 14 D.C.M.R. § 600.3.

4.     **Fee-Provision Claim.** JBGS's form lease provides: "You will reimburse us for all court costs we incur as a result of any legal action we bring against you for breach of this Lease, as awarded by the court. Such costs will be considered rent." ¶ 96. Plaintiff contends this Fee-Provision violates the Housing Code, which prohibits landlords from "plac[ing] . . . in a lease . . . a provision . . . requiring the tenant pay the owner's court costs[.]" 14 D.C.M.R. § 304.4; *see* ¶¶ 97–101.

5.     **Indemnification Claim**. Finally, the Complaint includes an additional CPPA subclaim that the lease provisions requiring Plaintiff to indemnify JBGS for personal injuries are also unlawful in violation of a separate Housing Code provision. *See* ¶ 118. Plaintiff has elected not to pursue this claim at this time, and takes no position on whether she has Article III standing to do so in federal court. As Plaintiff is not the removing party, it is not her burden to establish federal jurisdiction, which includes standing. *See infra note 2*; *Castro v. Molecular Sys.*, 963 F. Supp. 2d 3, 5 (D.D.C. 2013) ("As the party asserting federal jurisdiction, the removing Defendant bears the burden of showing that subject-matter jurisdiction exists.").

**LEGAL STANDARD**

To defeat a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023). The court "must treat the complaint's factual allegations as true, and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Id.*

**ARGUMENT**

**I.    Plaintiff's CPPA claims are adequately pled.**

For the following reasons, each of Plaintiff's CPPA claims are adequately pled applying basic principles of statutory construction. Since JBGS only challenges her standing to prosecute the Disclosure and Fee-Provision Claims, those arguments are addressed in each claim's respective section.[2]

**A.  The CPPA claims primarily turn on interpreting the RHA and Housing Code.**

The CPPA is unambiguous: "A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code § 28–3905(k)(1)(A); *see Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 723 (D.C. 2003) ("Trade practices that violate other laws . . . fall within the purview of the CPPA."). Applying *Bassin*, courts consistently hold

---

[2] As standing is an element of federal subject matter jurisdiction, should the Court find Plaintiff lacks standing to bring any claim, that claim must be remanded to D.C. Superior Court because the removal statute mandates that if the district court "lacks subject matter jurisdiction, the case <u>shall</u> be remanded." 28 U.S.C. § 1447(c); *see also Republic of Venezuela v. Philip Morris, Inc.*, 287 F.3d 192, 196 (D.C. Cir. 2002) ("When it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court <u>must</u> remand the case[.]") (emphases added). As standing is evaluated for each claim, claims for which Plaintiff does have standing should proceed in the federal forum JBGS invoked. *See Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1044 (D.C. Cir. 2010) ("The federal court may hear the claims for which federal jurisdiction exists.").

that "violating another [District] law or regulation in the context of a consumer transaction constitutes a *per se* violation of the CPPA." *Hettinger v. Bozzuto Mgmt. Co.*, 2025 U.S. Dist. LEXIS 138890, at *4 (D.D.C. July 21, 2025) (collecting cases and finding liability under CPPA claim predicated on RHA violation); *Dist. of Columbia v. 76M Inc.*, 2021 D.C. Super. LEXIS 157, *17-18 (D.C. Super. Ct. Dec. 2, 2021) (landlord's "unabated" housing code violations "amount[ed] to an unlawful trade practice" under CPPA). The CPPA also expressly states that it "shall apply to trade practices arising from landlord-tenant relations." D.C. Code § 28–3905(k)(6). This statutory provision must be applied with the understanding that the CPPA is a "broad consumer protection statute" meant to "assure that a just mechanism exists to remedy all improper trade practices." *Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 664 (D.C. 2024). Thus, the law "establishes an enforceable right to truthful information from merchants about consumer goods and services, and it is to be construed and applied liberally to effectuate that purpose." *Id.*

Each of Plaintiff's CPPA claims are primarily brought as unlawful trade practices claims predicated on violations of tenant protections established by the RHA and Housing Code. ¶ 118.[3] Whether Plaintiff has stated claims under the CPPA thus turns on resolving questions of statutory interpretation, which "begins, as always, with the text of the statute." *Chao v. Day*, 436 F.3d 234, 235 (D.C. Cir. 2006). When there is ambiguity as to the meaning of the plain text, "the paramount rule of statutory construction gives the statute that meaning which fulfills the purpose

---

[3] Plaintiff has also alleged each claim is an unfair trade practice prohibited by the CPPA, which is evaluated under a fact-specific balancing test that weighs whether the practice is (1) likely to cause substantial injury, (2) is not reasonably avoidable by consumers, and (3) not outweighed by countervailing benefits to consumers or competition. *Scott v. Apple, Inc.*, 757 F. Supp. 3d 1, 15 (D.D.C. 2024). As JBGS has not presented any argument to dismiss these unfairness subclaims, they should be permitted to proceed to discovery.

and intent of the legislature." *Hernstadt v. FCC*, 677 F.2d 893, 894 (D.C. Cir. 1980). That interpretive inquiry demonstrates that each of Plaintiff's claims is adequately pled, as follows.

**B. The Disclosure Claim is adequately pled and Plaintiff has standing to bring it.**

***i.*** **The Disclosure Claim is adequately pled.**

Plaintiff has stated an unlawful trade practice claim that JBGS failed to disclose the Service Fee to her in violation of the RHA's requirement to disclose a unit's "rent" "[a]t the time of application." D.C. Code § 42–3502.22(b)(1)(A) (hereinafter, "Section 3502.22(b)(1)(A)"). This interpretation is validated by *Hettinger*, which entered summary judgment against a landlord on a virtually identical CPPA claim, based on a landlord's violation of the RHA by failing to disclose a monthly service fee of $4.30 to a tenant at the time of application. *Hettinger*, 2025 U.S. Dist. LEXIS 138890, at *14. *Hettinger's* "straightforward" interpretation of the RHA's plain text involves just two steps, which affirm that Plaintiff has stated a claim here. *Id.*

First, the RHA defines "rent" as the "entire amount of money [] demanded, received, or charged by a housing provider as a condition of occupancy or use of a rental unit." D.C. Code § 42–3501.03(28). *Hettinger* held that a service fee fell within this definition of "rent." *Hettinger*, 2025 U.S. Dist. LEXIS 138890, at *14. It was "<u>money … received[]</u>" because it was "paid directly to" the landlord. *Id.* (quotation to RHA definition underlined). *Id*. The fee was also a "'<u>condition of occupancy or use</u>'" because the landlord had the right to evict for nonpayment (the condition of occupancy) and the fee was a "mandatory charge associated" with utilities (the condition of use). *Id.* (same).

Next, *Hettinger* interpreted the RHA's "unforgiving language" requiring a landlord to disclose "'[a]t the time a prospective tenant files an application … [t]he applicable rent for the rental unit.'" *Id.* at *24 (quoting Section 3502.22(b)(1)(A)). Because the service fee was "rent" and was not disclosed at the "[a]t the time" of application, that omission established liability

7

under the RHA. *Id.* at *27. Moreover, this RHA violation constituted a "*per se* violation of the CPPA" due to the consumer context of advertising apartments in rental applications. *Id.* This plain language interpretation was also bolstered by common sense, as *Hettinger* reasoned that neglecting to disclose a $4.30 service fee was "functionally equivalent" to informing the tenant that "her monthly rent was $2,272—instead of the $2,276 it actually was—[which] quite clearly would not have accurately disclosed the 'applicable rent for the rental unit' [as required by the RHA]." *Id.* at *22 (quoting Section 3502.22(b)(1)(A)).

The allegations in this case are no different. Plaintiff's lease required her to pay a monthly Service Fee of $5.00, which JBGS did not disclose to her at the time she filed her rental application. ECF 18-3 at 12, ¶¶ 41, 43, 53. This Service Fee is "rent" under the RHA for the same reasons that it was rent in *Hettinger*. It is "money [] received" by JBGS because Plaintiff pays it directly to JBGS. *See* ¶¶ 80–82, Ex. A, Ledger. And it is a "condition of occupancy" because JBGS retains the "right to evict" her for breaching the lease by not paying the Service Fee. ¶ 28, ECF 18-3 at 7 § 29 ("Default by Tenant" lease term providing right to evict). It is further a "condition of use" because the Service Fee is a mandatory charge associated with Plaintiff's use of her unit's utilities. *Id*. Thus, because the Service Fee is "rent," JBGS's failure to disclose it "[a]t the time" Plaintiff filed her rental application violated the RHA. ¶¶ 54–65. This RHA violation constitutes a *per se* violation of the CPPA because it occurred in the consumer context of advertising a rental unit to Plaintiff in a rental application. ¶¶ 41–44, 54–65. Finally, as in *Hettinger*, this result is confirmed with common sense, as JBGS's failure to disclose a mandatory $5.00 Service Fee is "functionally equivalent" to informing Plaintiff her rent was $1,560/month when it was really $1,565/month—which "quite clearly" would not be an accurate disclosure of her "rent" as required by the RHA. *Hettinger*, 2025 U.S. Dist. LEXIS 138890, at

8

*22. Given *Hettinger's* liability finding, it follows that the identical facts in this case are enough to state a CPPA claim. These same facts are likewise sufficient to state a deceptive trade practices claim, as a "reasonable jury could find that the disclosure of a $4.30 service charge is also material to the reasonable consumer's decision to apply to rent an apartment … and that the failure to disclose that charge pre-application tends to mislead." *Id.* at *33 (cleaned up, denying landlord's motion for summary judgment on deceptive trade practices claim).

JBGS's contrary arguments miss the mark. While JBGS attempts to distinguish *Hettinger* on the grounds that the plaintiff in that case had paid an application fee, that fact is immaterial to whether JBGS violated the RHA's requirement to disclose the Service Fee "[a]t the time" of application. *See* Mot. at 24. Nor is it relevant that JBGS disclosed that variable charges for utilities were not included, as Plaintiff is specifically challenging the failure to disclose the fixed Service Fee—not variable utility charges. ¶ 118.a.; *see* Mot. at 4. JBGS's conclusory contention that there is nothing misleading about omitting the Service Fee should not be credited either, as whether the failure to disclose a component of an apartment's price is material and has the tendency to mislead presents a "triable issue" of fact. *See* Mot. at 23; *see also Hettinger*, 2025 U.S. Dist. LEXIS 138890, at *33. Finally, JBGS's reliance on *Nanan v. Hines* is misplaced, as Judge Boasberg recognized that case's "reasoning supports [plaintiff's] position." *Id.*, at *17; *see* Mot. at 23. *Nanan*, an eviction case, declined to find that payments owed by a tenant to a third-party water utility were "rent," but reached that result by applying the same reasoning as *Hettinger*, which explained that: "[Th]e plain language reading [of the RHA] implies that, in general, rent constitutes <u>monetary payment</u> ('money []'), and that it <u>flows from the tenant to the landlord</u> ('demanded, received or charged')." *Id.* (quoting RHA). *Compare Hettinger*, 2025 U.S. Dist. LEXIS 138890, at *7 ("By transforming ordinary utility payments into monthly payments

9

made to [the landlord] as a condition of continued occupancy of the unit and use of the [building]'s services [the landlord] has backed itself into the very statutory definitions it now seeks to avoid.").

### ii. Plaintiff has standing to bring the Disclosure Claim because she has suffered monetary and informational injury.

"Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion*, 594 U.S. at 426. That inquiry, however, is straightforward when the statutory violations cause "monetary harms." *Id.* at 425. Such pocketbook injuries are among the "most obvious [of] traditional tangible harms" and thus "readily qualify as concrete injuries under Article III." *Id.* at 425; *see also Collins v. Yellen*, 594 U.S. 220, 243 (2021) ("[P]ocketbook injury is a prototypical form of injury in fact."); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (Kavanaugh, J.) ("A dollar of economic harm is still an injury-in-fact for standing purposes.").

The Disclosure Claim contends that JBGS failed to disclose a $5.00 Service Fee to Plaintiff at time she filed her rental application in violation of the RHA and CPPA. ¶ 58. This violation caused Plaintiff a monetary harm because she was later required to pay JBGS the undisclosed Service Fee monthly—a classic example of a pocketbook injury. *See* ¶¶ 80–82, Ex. A, Ledger. *See, e.g.*, *Seneca v. Homeaglow Inc.*, 2025 U.S. Dist. LEXIS 218375, at *23 (C.D. Cal. Sept. 23, 2025) (plaintiffs "charged for undisclosed membership fees" had standing); *Veera v. Banana Republic, LLC*, 6 Cal. App. 5th 907, 918 (Cal. Ct. App. 2016) ("The economic harm thus suffered is the difference between the advertised price plaintiffs should have been charged, and the full price plaintiffs actually paid.").

JBGS's arguments to the contrary are unavailing. First, the fact that Plaintiff did not pay an application fee is immaterial, Mot. at 12, because her economic harm accrued in paying the

10

undisclosed fees that JBGS omitted at the time of application, in violation of the RHA. Nor is JBGS's reliance on *Doe v. Bozzuto Mgmt. Co.* apposite as that court found no standing, based on the plaintiff's economic harm not being "linked to the[] misrepresentation or omission." 2024 U.S. Dist. LEXIS 110395, at *20 (D.D.C. June 24, 2024). That is not the situation here, where Plaintiff's payment of an undisclosed service fee is directly linked to JBGS's violation of a statutory requirement to disclose that fee.

Finally, even if the Court were to find no monetary harm, Plaintiff would still be able to establish standing by showing an informational injury because the RHA entitles her to truthful pricing information about rental units, and JBGS's failure to disclose her apartment's full price constitutes an informational injury. *See, e.g.*, *Hettinger*, 2025 U.S. Dist. LEXIS 138890, at *37 (Boasberg, J.) ("Courts have held that 'bait-and-switch' pricing schemes—in which the price initially advertised to consumers is lower than the price shown at the 'register'—can inflict a concrete injury, on consumers by causing them to either spend more time searching for full pricing information or make uninformed decisions.") (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). As the Third Circuit has held, plaintiffs can establish an informational injury if they can show a "substantive entitlement" to the omitted information, that "adverse effects" resulted from the omission, and a "requisite nexus to legislative intent." *Kelly v. Realpage Inc.*, 47 F.4th 202, 214 (3d Cir. 2022) (consumers established informational injury where credit reporting agency failed to disclose information on credit reports regarding the "source" of reported criminal records to which they were entitled under the FCRA) (applying *TransUnion*, 594 U.S. at 441–42).

Those elements are each present here. The RHA provides a substantive entitlement to a rental unit's pricing information. JBGS's failure to disclose the full price of the apartment to

Plaintiff caused adverse effects by impairing her ability to evaluate the true and accurate price of the apartment while progressing through the application process. *E.g.*, ¶ 47 (alleging Plaintiff was required to complete "income certification process" prior to receiving lease where Service Fee was belatedly disclosed). The requisite nexus to legislative intent is also met, as the D.C. Council has "establishe[d] an enforceable right to truthful information from merchants about consumer goods and services" through the CPPA, and made clear that its private right of action "shall apply to trade practices arising from landlord-tenant relations." D.C. Code §§ 28–3901(c); 28–3905(k)(6). Thus, Plaintiff can establish informational injury sufficient to demonstrate standing in this case.

### C. The Service Fee Claim is adequately pled.

Determining the legality of the Service Fee Claim should likewise begin and end with the plain text of a separate provision of the RHA. *Chao*, 436 F.3d at 235. This provision provides as follows (emphases added):

> **A housing provider shall not charge a fee to a prospective tenant** before move-in, **during a tenancy**, or after move-out **for services required of the housing provider to maintain a unit in a condition consistent with the implied warranty of habitability and with Titles 12 and 14** of the District of Columbia Municipal Regulations, or substantially similar subsequent regulations; except, that nothing in this subsection prohibits a housing provider from withholding a tenant's security deposit to replace damaged items if the tenant has caused damage to the unit beyond the standard of ordinary wear and tear as defined in § 42–3502.17(c)(3).

D.C. Code § 42–3505.10(b-2)(1) (hereinafter, "Section (b-2)(1)").

A plain reading of Section (b-2)(1) makes clear that the Service Fee is illegal. First, it is "charge[d] …. during [Plaintiff's] tenancy" by JBGS through the lease, which expressly provides that tenants "shall pay" the Service Fee. ECF 18-3 at 12. Second, the Service Fee is charged "for services required of the housing provider to maintain a unit in a condition consistent with the implied warranty of habitability." D.C. Code § 42–3505.10(b-2)(1). That RHA provision thus

12

prohibits landlords from charging fees related to the provision of utilities, which landlords are required to provide under the implied warranty of habitability and housing code. *See* 14 D.C.M.R. § 600.1 (requiring landlord to "provide and maintain … utilities").

JBGS's responses to this plain language interpretation are unavailing. It does not matter that the Service Fee is "associated with third-party utility billing," Mot. at 25, when JBGS directly charged it to Plaintiff in connection with the provision of utilities. Nor is there any substance to JBGS's emphasis on the latter clause of the statute, permitting a landlord to withhold security deposits for a tenant's damage to the unit beyond "wear and tear." *Id*. at 26. This "wear and tear" clause is more naturally read as a narrow exception to the general fee prohibition, permitting a landlord greater latitude to charge fees in the specific context of applying security deposits to cover physical damage to a unit. Nothing in Section 3505.10(b-2)(1) supports an expansion of the "wear and tear" carve-out to utilities-related fees like the Service Fee.

Finally, even if the statutory text was ambiguous, the D.C. Council's intent supports Plaintiff's interpretation. *See Hernstadt*, 677 F.2d at 894. In the Committee Report discussing the purpose of Section (b-2)(1), the D.C. Council stated:

> Housing providers have a duty to maintain units in a condition rendered habitable under the implied warranty of habitability and under designated housing code regulations. **The purpose of this section was to make sure housing providers are not passing the costs for which they are responsible onto tenants.** Under the bill, housing providers may still require a security deposit but can only keep the deposit to cover items that go beyond the standard of ordinary wear and tear on a unit.

ECF 18-6 at 5 (emphasis added). This passage shows that the intent behind Section (b-2)(1) was to broadly prohibit landlords from "passing the costs" of their own legal obligations to comply with District law through fees assessed to their tenants. This is precisely the practice alleged in the Complaint: JBGS requires Plaintiff and other tenants to pay a fee in connection with utilities

13

that JBGS must provide under the Housing Code. The Service Fee Claim is thus adequately pled under the RHA and CPPA.

### D. The Utility/Trash Claim is adequately pled.

Resolving the legality of whether JBGS can charge Plaintiff for common area electric utilities and trash services that are under JBGS's control likewise turns on interpreting the Housing Code. As relevant here, the Housing Code requires landlords to "<u>provide</u> [] utilities." 14 D.C.M.R. § 600.1. But in that same section, when the utility is "under the control of the owner or licensee," the landlord is required to "<u>furnish</u>[] and maintain[]" the utility. 14 D.C.M.R. § 600.3.

In this context, "furnish" should be interpreted to mean that a landlord must pay for utilities within the landlord's control. *See City of Roseville v. Norton*, 348 F.3d 1020, 1027 (D.C. Cir. 2003). (courts must "consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme"). Critically, where different terms are used in a single piece of legislation, the court must presume that [the legislature] intended the terms to have different meanings." *Transbrasil SA Linhas Aereas v. U.S. Dep't of Transp.*, 791 F.2d 202, 205 (D.C. Cir. 1986). District regulators chose to use different words as to a landlord's utility obligations, opening with a requirement that landlords "provide" utilities in Section 600.1—but using the distinct verb "furnish[]" specifically for utilities under the landlord's control in Section 600.3. Thus, "furnish" must mean something distinct from "provide" and should be interpreted to require the landlord to bear the cost of utilities within its exclusive control.

Indeed, courts interpreting the word "furnish" have reached the same conclusion in analogous contexts. *See, e.g.*, *Magna Vend v. Cournoyer*, 1985 Mass. App. Div. 75, 76 (Mass. Ct. App. 1985) (where contract required landlord to "provide" water utilities but "furnish reasonable heat," interpreting "furnish" to mean "pay for"); *Bendix Forest Prods. Corp. v. Div. of Occup. Safety & Health*, 25 Cal. 3d 465, 473 (Cal. 1979) ("[A] reasonable and ordinary

14

interpretation of 'furnish' [in safety regulation] … concomitantly requires the employer to pay for the safety equipment."). Such an interpretation is further consistent with the landlord's common law duty to maintain a property's common areas and the maxim that the Housing Code be construed liberally to protect tenants' rights. *See, e.g.*, *Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1061 (D.C. 2014) ("[T]he landlord, and not the tenant, bears the burden of maintaining the common areas."); *Valentine v. United States*, 706 F. Supp. 77, 81 (D.D.C. 1989) (Housing Code to be "construed liberally" as "comprehensive legislative scheme to protect tenants' rights").

JBGS's arguments are unpersuasive. First, its contention that "furnish" means "provide" renders the term redundant with Section 600.1's use of the word "provide," and thus transgresses the "presumption against surplusage." *Ind. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000); *see* Mot. at 27. Second, JBGS's reliance on other District laws that use the term "furnish[] without charge," is suspect due to the common-sense notion that courts should be "reluctant to interpret a word in accordance with the meaning given to the same word" in unrelated statutes. *Ass'n for Cmty. Aff. Plans v. U.S. Dep't of Treas.*, 392 F. Supp. 3d 22, 42 (D.D.C. 2019). In any event, looking to other statutes and regulations undermines JBGS's argument. For example, a workplace safety statute uses "furnish" to mean "pay for" in requiring employers to "furnish and use safety devices and safeguards" in the workplace. D.C. Code § 32–808(a). And further notably, District regulations expressly permit nonresidential landlords to recover common area utility charges from tenants—an express grant of authority conspicuously absent for residential landlords. *See* 15 D.C.M.R. § 4407 (provision applicable to "nonresidential rental unit[s]"); § 4407.12 (owner may "recover[] … the [nonresidential] tenant's fair share of electricity [] attributable to owner-paid areas").

15

Third, JBGS's contention that "furnish" can only mean "provide" because Section 600.3 is limited to "habitability concerns," Mot. at 28, again contravenes the rule against surplusage. *Hawke*, 211 F.3d at 643. Fourth, JBGS's citation to a consumer alert posted by the D.C. Office of the Attorney General should be accorded no weight, given that it is not a formal opinion, and amounts to an informal blog post that neither includes meaningful statutory analysis, nor discuss the Housing Code regulation at issue. *See* Mot. at 28–29; *see also Miller v. City of Tacoma*, 138 Wn.2d 318, 342 (Wash. 1999) (as even formal opinions of State Attorney General are "not binding, it follows that an informal interpretation of a statute is less so"). Finally, JBGS's citation to statutes that permit landlords to pass on specific fees such as those for "stormwater user fee[s]" only undermines its own argument, as such express authority to pass on specific utility-related fees implies a lack of authority to pass on others. *See* Mot. at 29; *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general.").

### E. The Fee Provision Claim is adequately pled and Plaintiff has standing to bring it.

#### i. The Fee Provision Claim is adequately pled.

Plaintiff's Fee Provision Claim also turns on interpreting the Housing Code, which provides: "No owner shall place (or cause to be placed) in a lease or rental agreement a provision … requiring that the tenant pay the owner's court costs or legal fees[.] This subsection shall not preclude a court from assessing court or legal fees against a tenant in appropriate circumstances." 14 D.C.M.R. § 304.4. JBGS's lease does precisely this, as it states: "<u>You will reimburse us for all court costs</u> we incur as a result of any legal action we bring against you for breach of this Lease, as awarded by the court. Such costs will be considered rent." ¶ 96 (emphasis added). JBGS's placement of a cost-shifting provision in Plaintiff's lease thus presents a straightforward violation of the Housing Code, which constitutes a CPPA violation because a residential lease is

16

a consumer transaction. *See, e.g.*, D.C. Code § 28–3905(k)(6) (CPPA "shall apply to trade practices arising from landlord-tenant relations"); *Goodman v. Mept Anthology, LLC*, 2024 D.C. Super. LEXIS 28, *8 (D.C. Super. Ct. Sept. 25, 2024) (certifying CPPA class of tenants bringing claims against landlord for unsanitary conditions in violation of lease agreements).

JBGS contends that its term is legal because it is qualified by language that the costs to be reimbursed are those "awarded by the court," Mot. at 30, and the Housing Code permits "court or legal fees" to be assessed in "appropriate circumstances," 14 D.C.M.R. § 304.4. But this argument ignores the basic fact that the Housing Code prohibits the act of "plac[ing]" a cost-shifting term in a lease, thus failing the elementary principle that courts "must give effect to all words of a statute when construing it." *AAPS v. FDA*, 226 F. Supp. 2d 204, 217 n.21 (D.C. Cir. 2002); *see also Place Definition*, Merriam-Webster, https://www.merriam-webster.com/dictionary/place ("to put in [] a particular place or position"). Indeed, the prohibition on the mere placement of cost-shifting terms in leases further indicates that a violation cannot be fixed by either some other term contorted to give curative effect or the contingent possibility a court may sever the term. This conclusion finds further support in the maxim that the "protections of D.C. housing law are part of a comprehensive legislative scheme to protect tenants' rights and therefore must be construed liberally." *Valentine v. United States*, 706 F. Supp. 77, 81 (D.D.C. 1989) (interpreting the Housing Code).

### ii. Plaintiff has standing to bring the Fee-Provision Claim because the statutory violation is analogous to contractual harm protected against by common law.

A plaintiff can establish the concrete injury necessary under Article III for a statutory violation by "identif[ying] a close historical or common-law analogue for their asserted injury." *TransUnion*, 594 U.S. at 414. A historical analogue establishes concrete injury because it provides assurance that the statutory violation is rooted in a "harm traditionally recognized as

17

providing a basis for a lawsuit in American courts" and is thus consonant with Article III. *Id.* In this way, *TransUnion*'s standing inquiry harmonizes Article III's injury requirement with the recognition that a legislature may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Id.* at 425. In recognition of that legislative power, the Supreme Court has made further clear that the common-law analogue need not be an "exact duplicate in American history and tradition." *Id.* at 424; *see also Gadelhak v. AT&T Servs.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (with respect to harm, common-law analogue looks for "close relationship in kind, not degree").

The Fee Provision Claim contends JBGS included in Plaintiff's lease a term requiring her to pay its court costs in violation of the Housing Code and CPPA, which prohibits merchants from "represent[ing] that a transaction confers [] rights . . . prohibited by law." ¶ 96; D.C. Code § 28–3904(e-1). JBGS's violation of the CPPA's prohibition of illegal contract terms has a close historical analogue to equity suits that could declare the rights of contracting parties and remedied contractual injuries. *See, e.g.*, *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 244 (1937) (party had "such an interest in the preservation of the contracts that he might maintain a suit in equity to declare them still in being"); *Attias v. Carefirst, Inc.*, 346 F.R.D. 1, 11 (D.D.C. 2024) ("[I]njury to rights recognized at common law—property, contracts, and torts—always have been regarded as sufficient for standing purposes.") (citing and quoting E. Chemerinsky, *What's Standing After TransUnion LLC v. Ramirez*, 96 N.Y.U. L. Rev. 269, 372 (2021)). Such a contractual form of injury is also analogous to the common law claim of the breach of implied covenant of good faith and fair dealing. *See* Restatement (Second) of Contracts § 205 (1981) (implied covenant requires contracting parties to adhere to "community standards of decency [and] fairness," and prohibits the "abuse of a power to specify terms").

The Supreme Court has also held that when a contract compels payment through "coercion," a suit to declare a party's contractual rights satisfies Article III, even if the party continues to comply with the contract to avoid the consequences of a breach. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) (Scalia, J.). For instance, in *MedImmune*, a plaintiff required to make royalty payments under a patent-related licensing contract brought suit under the federal Declaratory Judgment Act, seeking relief declaring that the patent was invalid and no royalties were due. *Id.* Plaintiff had not breached the contract at the time of the suit, and continued to pay royalties to avoid being sued in a patent infringement action that could result in "treble damages and attorney's fees." *Id.* at 122. *MedImmune* deemed the claim justiciable under Article III without a breach, reaffirming the principle that the "case or controversy [requirements] are met where payment of a claim is demanded as of right and where payment is made, but where the … coercive nature of the exaction preserves the right to recover the sums paid or to challenge the legality of the claim." *Id.* at 131 (quoting *Altvater v. Freeman*, 319 U.S. 359, 365 (1943)).

This case is no different. The legality of JBGS's Fee Provision, which has coercive effect in threatening monetary liability for costs in the event of breach, is a "substantial controversy, between parties having adverse legal interests" that is "definite and concrete"—and would be remedied by "specific relief through a decree of a conclusive character." *Id.* at 127. Imposing coercive effect by way of illegal contract term causes a harm analogous to breaching the implied covenant's requirements that contracting parties "community standards of decency [and] fairness," and abstain from "abus[ing] power to specify terms." Restatement (Second) of Contracts § 205 (1981). As in *MedImmune*, JBGS's Fee Provision presents a definite injury that sounds in contract, which is a justiciable controversy under Article III. Further supporting the

19

principle that there is nothing technical about restricting contractual rights is the fact that, throughout American history, a core function of the judiciary has been to resolve contractual disputes—even when no actual damages were at play. *See Attias*, 346 F.R.D. at 11 ("[T]he longstanding rule in America is that plaintiffs can pursue breach of contract claims without any evidence of damages because the breach itself unlocks the courthouse doors."). The CPPA's elevation of a right to challenge illegal terms in consumer contracts thus bears a "close relationship in kind," *Gadelhak*, 950 F.3d at 462, to contractual injuries that American courts have long been able to remedy and are therefore concrete injuries under Article III.

JBGS's arguments are hard to square with their practical effects. For instance, JBGS contends that tenants lack standing to challenge the Fee Provision unless the term is enforced. Mot. at 14. If that were true, then landlords could weaponize lease terms to threaten all kinds of illegal fees as a means to coerce tenant behavior, knowing that the conduct would evade judicial scrutiny so long as the landlords stopped short of enforcing the terms. But *MedImmune* rejected a similarly narrow interpretation of Article III that would have limited justiciability to instances in which the unlawful threat was actually enforced. *MedImmune*, 549 U.S. at 128 (applying principle that "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat" to find private contractual dispute justiciable notwithstanding lack of breach).

The lease term that purports to impose a monetary liability onto Plaintiff is thus concretely harmful, and settling the legality of that liability is a justiciable controversy under Article III. That concrete, contractual, and monetary obligation imposed on tenants makes this case entirely different from the "bare procedural violation" in JBGS's case-in-chief, which did not implicate any monetary consequence whatsoever. *Compare Hancock v. Urban Outfitters,*

20

*Inc.*, 830 F.3d 511, 514 (D.C. Cir. 2016) (consumer lacked standing where retailer's request for consumer's zip code in violation of privacy law was not a condition of purchase and thus had "no concrete consequence"). JBGS's remaining cases should be likewise disregarded, as the plaintiffs either failed to assert a common-law analogue or asserted one that did not map on to the statutory violation as Plaintiff has done here. *See, e.g.*, *Jones v. Glendale Apt. Props. LLC*, 2025 U.S. Dist. LEXIS 181882, at *8 (D. Md. Sept. 17, 2025) (no common-law analogue asserted); *Queen v. OliveTree Mgmt. LLC*, 2025 U.S. Dist. LEXIS 185112, at *5 (D. Md. Sept. 22, 2025) (same); *Zambali v. Shulman Rogers*, 2024 U.S. Dist. LEXIS 111183, at *12 (D. Md. June 25, 2024) (landlord's filing of rent collection lawsuit without requisite license did not map onto common-law analogue of defamation because tenant "admittedly did not timely make his rent payments" and thus unpaid rent claimed did not "disseminate inaccurate information").

## F.  There are no claims asserted against JBGS affiliates to dismiss.

Finally, JBGS requests the dismissal of claims brought against apartment buildings that it "d[oes] not manage." Mot. at 17. Such claims, however, are not before the Court because Plaintiff's single cause of action is brought strictly against JBGS for its own practices. ¶ 118. In substance, JBGS's request more closely resembles a motion to strike class allegations, which are properly deferred until after the pleading stage. *See Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012) ("A motion to strike class allegations . . . is even more disfavored because it requires a reviewing court to preemptively terminate the [litigation] . . . before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification."). To the extent JBGS's argument pertains to the class definitions as pleaded, such definitions are routinely modified at the certification stage where definitional problems can often be fixed as matters "of wording, not substance." *See In re White*, 64 F.4th 302, 313 (D.C. Cir. 2023) (reversing denial of certification because class definition was

21

improperly fail-safe and instructing that the proper "solution . . . is for the district court either to work with counsel to eliminate the problem or for the district court to simply define the class itself"). Thus, disputes about the class definition are likewise properly deferred to a later stage in this proceeding.

## II.    The primary jurisdiction doctrine does not apply.

### A.  Primary jurisdiction does not apply where no administrative remedy exists.

As a threshold matter, primary jurisdiction cannot be invoked in this case because "[w]here no administrative remedy exists, the doctrine of primary jurisdiction does not apply." *Dist.of Columbia. Water & Sewer Auth. v. Delon Hampton & Assocs.*, 851 A.2d 410, 417 (D.C. 2004). As the Rent Administrator lacks authority to adjudicate CPPA claims or award remedies afforded by the CPPA, that alone obviates the doctrine.

Moreover, even were Plaintiff's claims brought solely under the RHA and Housing Code, JBGS has failed to carry its burden of showing that the Rent Administrator would even be able to resolve those claims. While the RHA grants the Rent Administration some jurisdiction to resolve disputes, that jurisdiction is limited to disputes that can be resolved through administrative proceedings. *See* D.C. Code § 42–3502.04(c) ("The Rent Administrator shall have jurisdiction over those complaints and petitions arising under [the RHA] <u>which may be disposed of through administrative proceedings</u>.") (emphasis added). Moreover, the RHA is specific about what types of disputes can be disposed of through administrative proceedings. For example, tenants may "challenge a rent adjustment [] by filing a petition with the Rent Administrator," D.C. Code § 42–3502.06(e), and the "Office of Administrative Hearings may adjudicate complaints for the non-return of tenant security deposits," D.C. Code § 42–3502.17(b). Consistent with these express provisions, the agency's complaint form includes an enumerated checklist of issues that maps onto the disputes that the RHA expressly provides can be resolved through administrative

22

proceedings—such as challenges to rent adjustments and security deposits. *See* Ex. B, Rent Administrator Tenant Petition Form.

These express provisions indicate that the Rent Administrator could <u>not</u> resolve the statutory disputes in this case, as the RHA confers no authority to resolve them through administrative proceedings. *See RadLAX Gateway Hotel*, 566 U.S. at 645 (where a general and specific authorization exist side by side, the "terms of the specific must be complied with" in order to give effect to "every clause and part of a statute"). For its part, JBGS has presented no evidence to otherwise carry its burden, and instead invites the Court to kick this case to an agency that may not even be capable of resolving it. Such absence of any certainty as to administrative remedy should preclude invocation of the doctrine to this case. *See APCC Servs v. Worldcom, Inc.*, 305 F. Supp. 2d 1, 13 (D.D.C. 2001) (doctrine should be "invoked sparingly" because the "parties' interest in a swift resolution of their dispute must be balanced against those factors that might favor deferral").

### B.  The primary jurisdiction factors do not come close to being met.

Even were primary jurisdiction in play, the factors that courts traditionally consider all weigh against applying the doctrine. *United States v. Phillip Morris USA, Inc.*, 787 F. Supp. 2d 68, 78 (D.D.C. 2011) (these factors include "(1) whether the question at issue is within the conventional expertise of judges; (2) whether the question at issue lies particularly within the agency's discretion or requires the exercise of agency expertise; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made").

The first and second factors are entirely absent because each of Plaintiff's claims turn on statutory interpretation, which is "the daily fare" of judges and "does not involve technical or policy considerations within [an] agency's particular field of expertise." *Schiller v. Tower Semi.,*

*Ltd.*, 449 F.3d 286, 295 (2d Cir. 2006). As courts have the final word on matters of statutory construction, it would be backwards to punt those questions to a local administrative agency. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("The Framers also envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts.'"). JBGS cannot unsettle this core principle by invoking *Drayton v. Poretsky Mgmt, Inc.*, a case that deferred the technical question of "determin[ing] the validity of a rent increase" in the specialized context of rent-controlled properties, which are uniquely regulated by the Rent Administrator as part of a complex regulatory scheme. *See Drayton v. Poretsky Mgmt., Inc.*, 462 A.2d 1115, 1119–20 (D.C. 1983) (observing such properties were required to file "a certificate of calculation of [rent] increase[s] with the Rent Administrator"). That same specialized context also distinguishes JBGS's reliance on an oral ruling out of Superior Court, which likewise involved only rent-controlled properties distinctly subject to the Rent Administrator's authority.

As this case does not involve rent-controlled properties regulated by the Rent Administrator, there is no reason for the Court to abdicate the core judicial function of interpreting statutes and regulations to an administrative agency with inferior expertise. Indeed, the overwhelming majority of federal and local jurists have capably discharged this duty in independently interpreting the RHA and Housing Code without requiring an agency's assistance. *See, e.g.*, *Hettinger*, 2025 U.S. Dist. LEXIS 138890, at \*37 (interpreting RHA), *Equal Rights. Ctr. v. Vesta Corp.*, 2024 D.C. Super. LEXIS 44, at \*13–15 (D.C. Super. Ct. Sept. 19, 2024) (interpreting RHA); *Valentine*, 706 F. Supp. at 81 (interpreting Housing Code); *76M Inc.*, 2021 D.C. Super. LEXIS 157, at \*17–18 (interpreting Housing Code). This Court should do the same.

The third and fourth factors are also absent. There is no danger of inconsistent rulings because it remains unclear whether the Rent Administrator and even if it could, its interpretation

would be subordinate to a court's. *See Loper Bright*, 603 U.S. at 386. Nor has any prior application to the Rent Administrator been made, as Plaintiff properly brought her CPPA claims in Superior Court as contemplated by the statute's private right of action. *See* D.C. Code § 28–3905(k)(2).

Finally, the impropriety of applying primary jurisdiction in this case is driven home by the D.C. Council's express intent to apply the CPPA to the RHA. In 2018, the Council amended the CPPA's private right of action to expressly "apply to trade practices arising from landlord-tenant relations." D.C. Code § 28–3905(k)(6). In so doing, the Council expressed intent to expand the CPPA to cover existing tenant protections including the RHA, stating: "The District, which otherwise has robust tenant protections …. should extend those protections to tenant-consumers under the CPPA." D.C. Council Comm. Report re: Bill 22–0170 at 4 (Sept. 20, 2018), https://perma.cc/52ZP-GQ98. The Committee Report confirmed the CPPA encompasses the RHA (and more) by stating that the legislative committee "agree[d] with the testimony" of a tenant advocate witness who "testified that a private right of action under the CPPA is important because the Rental Housing Act of 1985 does not cover all the deceptive practices in which a landlord could engage and does not have remedies as expansive as the CPPA." *Id.* On this legislative record, primary jurisdiction should not be contorted to frustrate the Council's intent to provide tenants the right to vindicate their RHA rights in court through the CPPA. Questions of statutory interpretation are to be resolved by courts, not relegated to administrative limbo.

## CONCLUSION

For the foregoing reasons, the Court should deny JBGS's Motion to Dismiss in full.

DATED: April 10, 2026                    Respectfully submitted,

*/s/ E. Vanessa Assae-Bille*
E. Vanessa Assae-Bille [Bar No. 1614715]
**BILLE PLLC**
1601 Connecticut Ave., Ste. 800
Washington, D.C. 20009
(202) 810-1270 (Tel.)
vanessa@billelaw.com

*/s/ Randolph T. Chen*
Randolph T. Chen [Bar No. 1032644]
Jason S. Rathod [Bar No. 1000882]
**MIGLIACCIO & RATHOD LLP**
412 H St., NE, Suite 302
Washington, D.C. 20002
(202) 470-3520 (Tel.)
(202) 800-2730 (Fax)
rchen@classlawdc.com

*/s/ Sparky Abraham*
Daniel "Sparky" Abraham (CA Bar No. 299193)
*Application for pro hac vice forthcoming*
**JUBILEE LEGAL**
300 E Esplanade Dr. Ste 900
Oxnard, CA 93036
Office: (805) 946-0386
sparky@jubilee.legal

*Counsel for Plaintiff*

26